1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                         DISTRICT OF IDAHO

10                         ----oo0oo----

11

12   ROBERT and AMIE PANICACCI, as        No. 1:21-cv-00329 WBS
     legal guardians and parents of
13   G.P., a minor,

14              Plaintiffs,              MEMORANDUM AND ORDER RE:
                                         CROSS MOTIONS FOR SUMMARY
15        v.                             JUDGMENT

16   WEST ADA SCHOOL DISTRICT #2,

17              Defendant.

18

19                         ----oo0oo----

20        Robert and Amie Panicacci ("plaintiffs"), as legal

21   guardians and parents of G.P., initiated this action against West

22   ADA School District #2 ("defendant") alleging violations of the

23   Individuals with Disabilities Act ("IDEA"), 20 U.S.C. §§ 1400 et

24   seq., the American with Disabilities Act ("ADA"), 42 U.S.C. §§

25   12101, et seq., and the Rehabilitation Act ("RA"), 29 U.S.C. §

26   794.  (See First Am. Compl. (Docket No. 32).)  Before the court

27   are defendant's motion for summary judgment as to all claims and

28   plaintiffs' motion for partial summary judgment as to review of

                                   1

1    the hearing officer's decision on plaintiff's IDEA claim.[1]

2    (Docket Nos. 41, 43.)

3    I.    Background

4          A.    Undisputed Facts

5                In September 2020, plaintiffs and their child, G.P.,

6    moved from California to Idaho.  (Def.'s Statement of Undisputed

7    Facts ("DSUF") ¶ 9 (Docket No. 41-2).)  G.P. had been diagnosed

8    with autism and received special education services at his

9    elementary school in California pursuant to an Individualized

10   Education Program ("IEP").[2]  (Id. ¶ 2.)

11               G.P.'s most recent evaluation for an IEP occurred in

12   August 2017 and thus his IDEA mandated triennial assessments were

13   due.[3]  (DSUF ¶ 8.)  The triennial assessments were not completed

14       _____

         [1]    Both sides also filed motions opposing the other
15   party's expert report.  Plaintiffs moved to exclude the report of
     defendant's expert, Andrea Cox (Docket No. 46), and defendant
16   moved to strike the report of plaintiffs' expert, Alison
     Bickelman (Docket No. 63).  For the reasons discussed at oral
17   argument, the court will consider the arguments advanced in these
     motions as going to the weight of the evidence, not
18   admissibility, and will accordingly deny both motions.
               Plaintiffs also submitted a motion for leave requesting
19   that the court accept various materials which were filed late.
     (Docket No. 55.)  Because the delay did not result in any
20   prejudice, the court will grant plaintiffs' motion and accept the
     late filings.

21       [2]    An "IEP" is "a written statement for each child with a
22   disability that is developed, reviewed, and revised," which
     includes things such as: "a statement of the child's present
23   levels of academic achievement and functional performance"; "a
     statement of measurable annual goals, including academic and
24   functional goals"; and "a description of how the child's progress
     toward meeting the annual goals . . . will be measured."  20
25   U.S.C. § 1414 (d)(1)(A).

26       [3]    Under the IDEA, a child with a disability must be
27   reevaluated "at least once every 3 years, unless the parent and
     the local education agency agree that a reevaluation is
28   unnecessary."  20 U.S.C. § 1414(a)(2)(B)(ii).

by the California school because of the COVID-19 pandemic school closures.  (See Hansen Decl., Ex. A ("Hr'g Officer Decision") at 6 (Docket No. 41-4).)  Further, G.P.'s IEP had expired in May 2020 (the "Expired IEP").  (Id. at 4.)  The California school prepared a new IEP dated August 20, 2020 (the "Transfer IEP") to inform defendant what services G.P. had been provided.  (DSUF ¶ 3.)  The Transfer IEP was set to expire on October 13, 2020. (Id.)

The Transfer IEP did not contain any specific goals or objectives nor any prescribed methodologies to be used for G.P.'s behavior services.  (DSUF ¶¶ 6-7.)  Neither the Transfer IEP nor the Expired IEP contained specifics about who should provide, or any qualifications needed in order to provide, G.P.'s behavior services.  (DSUF ¶ 7; Hr'g Officer Decision at 5.)

On September 28, 2020, the parties met to discuss G.P.'s special education needs.  (DSUF ¶ 10.)  Shortly thereafter, G.P. began the 2020-2021 school year at defendant's elementary school.  (Id. ¶ 11.)  Defendant used a paraprofessional to provide G.P. special education services. (Id. ¶ 12.)

On October 13, 2020 (the day the Transfer IEP was set to expire), the parties held G.P.'s first IEP meeting since plaintiffs relocated to Idaho.  (Id. ¶ 14.)  At this meeting, defendant indicated that the Transfer IEP was insufficient because it did not contain any goals or objectives.[4]  (Id.)

---

[4]    An IEP should contain academic and functional goals as well as describe how the child is progressing toward meeting these goals.  See 20 U.S.C. § 1414(d)(1)(A).

Further, the parties discussed whether defendant's use of a paraprofessional was appropriate.  (Id. ¶ 16.)  Instead of a paraprofessional, G.P.'s school in California had used an Applied Behavior Analysis ("ABA") therapist.  (Id.)

In addition, the parties considered various goals for G.P. as well as reviewed information obtained from G.P.'s previous school and informal assessments collected by G.P.'s current teachers.  (Id. ¶ 15.)  The parties used this information to develop an interim IEP (the "Interim IEP").  (Id.)  The Interim IEP included goals and objectives in areas of communications, mathematics, reading, writing, and social-emotional needs.  (Id. ¶ 17.)  Defendant then began providing G.P. with special education services consistent with the Interim IEP.  (Id.)

Two weeks later, the parties held another IEP meeting. (Id. ¶ 18.)  At this meeting, defendant indicated that various assessments were needed.  (Id.)

On November 11, 2020, the parties held yet another meeting during which plaintiffs agreed to some of the assessments requested by defendant.  (Id. ¶ 19.)  However, plaintiffs would not agree to any behavior assessments.  (Id.)

After the November meeting, plaintiffs were sent a consent form so defendant could proceed with their requested assessments.  (Id. ¶ 20.)  Plaintiffs signed the consent form, but specifically excluded the requested behavior assessment and added a note explicitly denying consent for any behavior assessment.  (Id.)  To date, plaintiffs have not authorized defendant to conduct any behavior assessments.  (Id. ¶ 21.)

1      While attending defendant's school, G.P. has been
2  accompanied by a paraprofessional for most, if not all, of his
3  school day.  (Id. ¶ 22.)  The paraprofessional provides one-on-
4  one special education services in G.P.'s general education
5  classroom, during lunch, and at recess.  (Id. ¶ 27.)

6      B.   Procedural History

7      On March 2, 2021, plaintiffs submitted a Due Process
8  Complaint to the Idaho Department of Education.  (Hr'g Officer
9  Decision at 1.)  A due process hearing was held on May 26-27,
10 2021, and the hearing officer found that defendant did not deny
11 G.P a "free appropriate public education" (a "FAPE") under the
12 IDEA.  (Id., at 12-14.)

13     Plaintiffs then filed this action seeking review of the
14 hearing officer's decision.  (See Docket No. 1.)  On May 5, 2022,
15 this court granted plaintiffs' motion to amend to add claims
16 under the ADA and RA.  (See Docket No. 30.)

17 II.  Legal Standard

18     "Summary judgment is appropriate when, viewing the
19 evidence in the light most favorable to the non-moving party,
20 there is no genuine dispute as to any material fact."  Acosta v.
21 City Nat'l Corp., 922 F.3d 880, 885 (9th Cir. 2019).  A material
22 fact is one that could affect the outcome of the suit, and a
23 genuine issue is one that could permit a reasonable trier of fact
24 to enter a verdict in the non-moving party's favor.  Anderson v.
25 Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

26     The moving party bears the initial burden of
27 establishing the absence of a genuine issue of material fact and
28 can satisfy this burden by presenting evidence that negates an

1    essential element of the non-moving party's case.  See Celotex
2    Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  Alternatively,
3    the movant can demonstrate that the non-moving party cannot
4    provide evidence to support an essential element upon which it
5    will bear the burden of proof at trial.  Id.  The burden then
6    shifts to the non-moving party to set forth specific facts to
7    show that there is a genuine issue for trial.  See id. at 324.
8    Any inferences drawn from the underlying facts must, however, be
9    viewed in the light most favorable to the non-moving party.  See
10   Matsushita Elec. Indus. Co. v. Zenith Radio, 475 U.S. 574, 587
11   (1986).
12   III. IDEA (Claim 1)
13        A.   Statutory Framework
14             The IDEA "was designed to reverse a history of
15   educational neglect for disabled children."  Timothy O. v. Paso
16   Robles Unified Sch. Dist., 822 F.3d 1105, 1109 (9th Cir. 2016)
17   (citing Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 52
18   (2005)).  It seeks "'to ensure that all children with
19   disabilities have available to them a free appropriate public
20   education that emphasizes special education and related services
21   designed to meet their unique needs' and 'to ensure that the
22   rights of children with disabilities and parents of such children
23   are protected.'"  Tamalpais Union High Sch. Dist. v. D.W., 271 F.
24   Supp. 3d 1152, 1154 (N.D. Cal. 2017) (quoting 20 U.S.C. §§
25   1400(d)(1)(A)-(B)).  These goals are achieved through the
26   development of an IEP.[5]  See Ojai Unified Sch. Dist. v. Jackson,
27   ─────────────────────
28        [5]   There are multiple requirements of an IEP and a failure
     to include such requirements constitutes a substantive violation

1    4 F.3d 1467, 1469 (9th Cir. 1993) (citing 20 U.S.C §

2    1401(a)(18)(D)).

3        "When a party objects to the adequacy of the education

4    provided . . . IDEA provides procedural recourse . . . ."

5    Timothy O., 822 F.3d at 1155.  "During a due process hearing, the

6    hearing officer will decide whether the school district committed

7    a substantive or procedural violation."  Id. (citing 20 U.S.C. §

8    1415(f)(3)(E)).  "A substantive violation lies if a child was

9    denied a FAPE."  Id. (citing 20 U.S.C. § 1415(f)(3)(E)(i)).  For

10   procedural violations, however, a hearing officer may find a

11   child was denied a FAPE "only if the procedural violation '(I)

12   impeded the child's right to a free appropriate public education;

13   (II) significantly impeded the parents' opportunity to

14   participate in the decisionmaking process regarding the provision

15   of a free appropriate public education to the parents' child; or

16   (III) caused a deprivation of educational benefits.'"  Id. at

17   1155-56 (quoting 20 U.S.C. § 1415(f)(3)(E)(ii)).

18       B.   Standard of Review

19       "[J]udicial review in IDEA cases differs substantially

20   from judicial review of other agency actions, in which courts are

21   generally confined to the administrative record and held to a

22

23

---

24   of the IDEA.  See id. at 1469.  The IDEA also contains procedural
     safeguards.  See id.  For example, "the IDEA requires that
25   parents be afforded a significant and collaborative role in the
     development of a child's IEP" and "have sufficient information to
26   understand and participate meaningfully in all aspects of that
     discussion."  Timothy O., 822 F.3d at 1111-12 (citing Winkelman
27   ex rel. Winkelman v. Parma City Sch. Dist., 550 U.S. 516, 524
     (2007); M.M. v. Lafayette Sch. Dist., 767 F.3d 842, 851 (9th Cir.
28   2014)).

1   highly deferential standard of review."[6]  Ojai, 4 F.3d at 1471

2   (citation omitted).  When reviewing a hearing officer's

3   determination in an IDEA case, the district court should "read

4   the administrative record, consider new evidence, and make an

5   independent judgement based on the preponderance of evidence and

6   giving due weight to the hearing officer's determinations."

7   Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Waternberg,

8   59 F.3d 884, 892 (9th Cir. 1995).  Further, "the IDEA does not

9   empower courts to 'substitute their own notions of sound

10  educational policy for those of the school authorities which they

11  review.'"  Ojai, 4 F.3d at 1472 (quoting Gregory K. v. Longview

12  Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987) (additional

13  citations and quotations omitted).

14      C.   Discussion

15          The parties' cross-motions for summary judgment on

16  plaintiffs' IDEA claim focus on two issues: (1) whether defendant

17  denied G.P a FAPE by using a paraprofessional instead of an ABA

18  therapist to provide behavioral services; and (2) whether

19  defendant denied plaintiffs the right to an Independent

20  Educational Evaluation ("IEE") at public expense under 34 C.F.R.

21  § 300.502(b)(1).  Because for the following reasons the court

22  finds disputed questions of material fact on each of those

23  issues, both motions must be denied.

24          1.   Use of a Paraprofessional

25

26      [6]   Some courts have explained that a motion for summary
    judgment which seeks review of a hearing officer's decision is
27  "more accurately described as a judgment on the record."  G.J. v.
    Muscogee Cnty. Sch. Dist., 668 F.3d 1258, 1267 (11th Cir. 2012)
28  (citation omitted).

Under the IDEA, "a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in another State" must be provided "services comparable" until a new IEP is developed.  See 20 U.S.C. § 1414(d)(2)(C)(i)(II). Although the statute does not define "comparable" services, "comparable" is typically defined as "similar" or "equivalent." See Assistance to States for the Educ. of Child. With Disabilities & Presch. Grants for Child. With Disabilities, 71 Fed. Reg. 46540, 46681 (Aug. 14, 2006) ("[T]he Department interprets 'comparable' to have the plain meaning of the word, which is 'similar' or 'equivalent.'").  Thus, "when used with respect to a child who transfers to a new public agency . . . 'comparable' services means services that are 'similar' or 'equivalent' to those that were described in the child's IEP from the previous public agency, as determined by the child's newly-designated IEP Team in the new public agency."  Id.

To determine whether services are "similar" or "equivalent," courts compare the services and objectives as articulated on a student's IEP as well as within the school context as a whole.  See Sterling A. ex rel. Andrews v. Washoe Cnty. Sch. Dist., No. 3:07-cv-245, 2008 WL 4865570, at *5-6 (D. Nev. Nov. 10, 2008) (finding services "comparable" where the only difference was the location of the services being offered); West Orange Bd. of Educ. v. B.R. o/b/o B.R., No. 21-cv-13849, 2022 WL 2903341, at *5 (D. N.J. July 22, 2022) (finding services were not "comparable" where there was "significant differences in class size, school size, student-teacher ratio, and the proportion of

1  classified students per class").

2         Here, the only description of "Behavior Intervention
3  Services" in the Transfer IEP are the general statements relating
4  to the duration and frequency of services.  (Hr'g Officer
5  Decision at 11.)  The Transfer IEP stated that "Behavior
6  Intervention Services" were to be provided by a "Nonpublic agency
7  (NPA) under contract with SELPA[7] or district" for 1950 minutes
8  per week.  (Id. at 5.)  The Transfer IEP neither specified that
9  behavior services must be provided by an ABA therapist nor
10 provided any objectives that would have indicated that services
11 provided by a paraprofessional would not meet the requirements of
12 the IEP.  (DSUF ¶¶ 6-7.)

13        The Interim IEP's description of behavior services is
14 nearly identical.  It stated that "Behavior Skill Services" are
15 to be provided by a "special education teacher" for 1950 minutes
16 per week.  (Hr'g Officer Decision at 7.)  Like the Transfer IEP,
17 the Interim IEP did not describe or prescribe any methodologies
18 to be used with the provision of these behavior services,
19 including whether the services were to be provided by an ABA
20 therapist or paraprofessional.  (Id. at 5.)

21        Although the use of an ABA therapist is not specified
22 in G.P.'s IEPs, plaintiffs argue that defendant's use of a
23 paraprofessional to provide G.P. with behavior services under the
24 Interim IEP is not "comparable" to his California school's use of

25        [7]  A "SELPA" is an acronym for a Special Education Local
26 Plan Area, which is a group of school districts, charter schools,
   and County Offices of Education which provide special education
27 services to students with disabilities.  See A Brief History of
   Special Education, SELPA Adm'rs of Cal.,
28 https://selpa.info/info/legal.

ABA therapists.  (Pls.'s Opp'n at 10-13 (Docket No. 53).)  At the administrative hearing, testimony showed that ABA therapists differ from paraprofessionals because ABA therapists receive specific developmental-disorder training, are subject to direct oversight, and have more experience working with kids with autism.  (Pls.' Reply at 9 (Docket No. 60); see generally Hearing Transcript (Docket No. 41-5).)  Further, plaintiffs' expert witness described ABA therapists as "the gold standard for clients with autism" and having "more of a specialized experience and education with working with kids with autism."  (Hr'g Officer Decision at 13.)

The hearing officer concluded that plaintiffs had not shown that "the behavior services [G.P.] received from paraprofessionals would be any different than the services that [G.P]. would receive from an ABA therapist."  (Id.)  The hearing officer's decision focused on the fact that the IEPs both provided for 1950 minutes per week of behavior services and did not specify that behavior services be provided by an ABA therapist.

However, that ABA therapists and paraprofessionals receive different training and are subject to differing levels of oversight does not mean they may not provide "comparable" services.  The most important question is what behavioral services the treating therapists in California were in fact providing to G.P. and whether the paraprofessionals in Idaho could offer comparable services.  The record before the hearing officer and this court is insufficient to allow the court to answer that question.  From the existing record, the court could

11

1  draw either the inference that the hearing officer did or the

2  contrary inference depending upon the court's own assessment of

3  whether the Idaho paraprofessionals are able to offer treatment

4  sufficiently similar or equivalent to what the ABA therapists

5  were able to provide and were actually providing in California.

6  Summary judgment must therefore be denied on plaintiffs' IDEA

7  claim.

8            2.   <u>Independent Educational Evaluation ("IEE")</u>[8]

9            Federal regulations provide that parents of a child

10 with a disability have the right to an IEE "at public expense if

11 the parent disagrees with an evaluation obtained by the public

12 agency."  34 C.F.R. § 300.502(b)(1).  Defendant takes the

13 position that it had not yet made its evaluation because

14 plaintiffs refused to allow defendant to conduct its own

15 behavioral assessment.  Plaintiffs' position is apparently that

16 they did not have to consent to defendant's assessment, and that

17 defendant was required to make its evaluation without the benefit

18 of that assessment.

19            It is unclear why plaintiffs would not consent to the

20 behavioral assessment requested by defendant.  The court can find

21 no evidence in the record that plaintiffs had anything to lose by

22 giving their consent.  At the administrative hearing, plaintiffs

23 stated that they would not allow defendant to conduct a behavior

24 assessment because they "did not trust" that defendant "would be

25 unbiased."  (Hr'g Officer Decision at 8.)  Plaintiffs proffer no

26 ────────────

27      [8]   An "IEE" is "an evaluation conducted by a qualified
examiner who is not employed by the public agency responsible for
the education of the child in question."  34 C.F.R. §
28 300.502(b)(1).

1  coherent reason why they could not have consented to defendant's

2  assessment before concluding that it would be biased.

3          "The right to a publicly funded independent educational

4  evaluation does not obtain until there is a reevaluation with

5  which the parents disagree." G.J. v. Muscogee Cnty. Sch. Dist.,

6  668 F.3d 1258, 1266 (11th Cir. 2012); V.M. v. North Colonie Cent.

7  Sch. Dist., 954 F. Supp. 2d 102, 118 (N.D. N.Y. 2013)

8  ("Plaintiff's repeated failure to provide [d]efendant with

9  consent to perform updated evaluations precludes her from

10 asserting that [student] was denied a FAPE . . . ."); D.Z. v.

11 Bethlehem Area Sch. Dist., 2 A.3d 712, 729 (Pa. Commw. Ct. 2010)

12 ("The statutory scheme makes clear that it is only after the

13 [s]chool [d]istrict is granted permission to reevaluate and then

14 completes that reevaluation that [plaintiff's] parental right to

15 request an IEE . . . vests.").

16          Plaintiffs argue to this court that defendant's review

17 of G.P.'s school record, including his prior IEPs, to create the

18 Interim IEP constituted an evaluation with which they disagree

19 and therefore their right to an IEE has vested.  (Pls.' Mot. at

20 3.)  The regulations upon which plaintiffs rely prescribe what a

21 public agency must do when conducting an evaluation.  See 34

22 C.F.R. § 300.15 ("Evaluation means procedures used in accordance

23 with §§ 300.304 through 300.311 to determine whether a child has

24 a disability and the nature and extent of the special education

25 and related services that the child needs."); 34 C.F.R. §

26 300.304(b)(1) ("In conducting the evaluation, the public agency

27 must use a variety of assessment tools and strategies to gather

28 relevant functional, developmental, and academic information

1  about the child").

2  These regulations do not prescribe exactly what type of
3  evaluation is sufficient to trigger a parent's right to an IEE.
4  Further, at oral argument, the parties were unable to direct the
5  court to any regulation or caselaw purporting to show the type of
6  evaluation a school district must conduct before a parent has the
7  right to an IEE.  It is reasonable to read the record to suggest
8  that defendant wanted to provide plaintiffs with an IEE but
9  needed to gather more information by first conducting its
10  behavior assessment of G.P.  It is just as reasonable to read the
11  record to suggest that plaintiffs presumed that defendant's
12  review of G.P.'s record, which was apparently sufficient to
13  create the Interim IEP, constituted an evaluation and therefore
14  plaintiffs' right to an IEE had vested.  Because reasonableness
15  is characteristically a question of fact, the court cannot make
16  that determination on summary judgment.

17  IV.  ADA and RA (Claims 2 and 3)

18  Defendant also seeks summary judgment on plaintiffs'
19  claims under the ADA and RA.[9]  (See generally Def.'s Mot.)
20  Because plaintiffs' ADA and RA claims do not differ in any
21  material sense, the court will address the claims together.  See
22  Zukle v. Regents of Univ. of Cal., 166 F.3d 1041, 1045 n. 11 (9th
23  Cir. 1999) ("There is no significant difference in analysis of
24  the rights and obligations created by the ADA and the
25  Rehabilitation Act . . .  Thus, courts have applied the same
26  analysis to claims brought under both statutes."); see also A.G.

27  ────────────
28  [9]   Plaintiffs did not move for summary judgment on their
ADA and RA claims.

1  v. Paradise Valley Unified Sch. Dist. No. 69, 815 F.3d 1195, 1203

2  (9th Cir. 2016) (analyzing ADA and RA claim together); Duvall v.

3  Cnty. of Kitsap, 260 F.3d 1124, 1135-36 (9th Cir. 2001) (same).

4       "[T]o bring a suit under the ADA and Section 504 [of

5  the RA] requires the same elements: (1) the child is a qualified

6  individual with a disability; (2) she was denied a reasonable

7  accommodation that she needs to enjoy meaningful access to the

8  benefits of public services; and (3) the program providing the

9  benefit receives federal financial assistance." McIntyre v.

10 Eugene Sch. Dist. 4J, 976 F.3d 902, 912 (9th Cir. 2020)

11 (citations omitted).  Here, the first and third factors are

12 undisputed and easily satisfied.  Thus, these claims turn on

13 whether G.P. was denied a reasonable accommodation.

14      "To succeed on a failure-to-accommodate claim . . . a

15 plaintiff must show that a public entity failed to make

16 reasonable modifications that would accommodate plaintiff's

17 disability without fundamentally altering the nature of [the]

18 program or activity, and that the accommodation would have

19 enabled the plaintiff to meet the program's essential eligibility

20 requirements." Selene v. Legislature of Idaho, 514 F. Supp. 3d

21 1243, 1256 (D. Idaho 2021).  "Reasonableness 'depends on the

22 individual circumstances of each case, and requires a fact-

23 specific, individualized analysis of the disabled individual's

24 circumstances and the accommodations that might allow him to

25 [enjoy meaningful access to the program.]'" Mark H. v. Hamamoto,

26 620 F.3d 1090, 1098 (9th Cir. 2010) (quoting Vinson v. Thomas,

27 288 F.3d 1145, 1154 (9th Cir. 2002)).

28      Here, plaintiffs alleged that defendant failed to

1    provide G.P. with accommodations that would allow him to access

2    defendant's "school, its activities[,] and its programs."  (First

3    Am. Compl. ¶¶ 40, 50.)  Plaintiffs make clear in their Opposition

4    that the accommodation at issue is defendant's use of a

5    paraprofessional.  (See Pls.' Opp'n at 15-16.)  As explained

6    above, whether defendants' use of a paraprofessional is

7    "comparable" to an ABA therapist is a disputed question of fact.

8    For similar reasons, whether defendants' use of a

9    paraprofessional, in lieu of an ABA therapist, was reasonable

10   under the ADA and RA is a disputed question of fact.

11        As part of their ADA and RA claims, plaintiffs allege

12   that defendant acted "intentionally, with willful misconduct, or

13   with deliberate indifference . . . ."  (See First Am. Compl. ¶¶

14   46, 54.)  Under the ADA and RA, "[a] public entity can be liable

15   for damages . . . if it intentionally or with deliberate

16   indifference fails to provide meaningful access or reasonable

17   accommodation to disabled persons."  McIntyre, 976 F.3d at 912

18   (quotation and citation omitted).  A defendant "acted with

19   deliberate indifference if it (1) had knowledge that a harm to a

20   federally protected right is substantially likely, and (2) failed

21   to act upon that likelihood."  Mark H., 620 F.3d at 1099

22   (quotation and citation omitted).

23        Here, it is undisputed that defendant was aware of

24   G.P.'s autism diagnosis and need for behavioral services.

25   However, whether defendant had any knowledge that providing G.P.

26   with paraprofessionals instead of ABA therapists would deny him

27   access his education, and therefore acted with deliberate

28   indifference towards G.P.'s needs for behavioral services, is a

1 | disputed question of fact.  Accordingly, defendant's motion for

2 | summary judgment on plaintiffs' ADA and RA claims will be denied.

3 |          IT IS THEREFORE ORDERED that defendant's motion for

4 | summary judgment (Docket No. 41) and plaintiffs' motion for

5 | partial summary judgment (Docket No. 43) be, and the same hereby

6 | are, DENIED.

7 | Dated:  August 17, 2023

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE