UNITED STATES DISTRICT COURT

DISTRICT OF IDAHO

----oo0oo----

| | |
|---|---|
| ROBERT and AMIE PANICACCI, as legal guardians and parent of G.P., a minor,<br><br>    Plaintiffs,<br><br>    v.<br><br>WEST ADA SCHOOL DISTRICT #2,<br><br>    Defendant. | No. 1:21-cv-00329 WBS<br><br>MEMORANDUM OF DECISION, <u>FINDINGS OF FACT, AND CONCLUSIONS OF LAW</u> |

----oo0oo----

Robert and Amie Panicacci ("plaintiffs"), as legal guardians and parents of G.P., initiated this action against West Ada School District #2 ("defendant") alleging violations of the Individuals with Disabilities Act ("IDEA"), 20 U.S.C. §§ 1400, et seq.; the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101, et seq.; and the Rehabilitation Act, 29 U.S.C. § 794. (<u>See</u> First Am. Compl. (Docket No. 32).)  The court conducted a jury trial on the ADA and Rehabilitation Act claims, which resulted in a jury verdict for defendant on both claims.

1

It was stipulated that the court may consider the evidence at that trial, along with any additional evidence the parties may submit, in ruling upon plaintiffs' IDEA claim. The court having considered such evidence, along with the parties' written submissions and oral argument, now rules on plaintiffs' IDEA claim as follows. This memorandum constitutes the court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).

I.   Factual and Procedural History

In September 2020, plaintiffs and their child, G.P., moved from California to Idaho. G.P. had been diagnosed with autism and received special education services at his elementary school in the Newhall School District in California ("Newhall") pursuant to an Individualized Education Plan ("IEP").

G.P.'s most recent evaluation for an IEP occurred in August 2017 and thus his IDEA-mandated triennial assessments were due in 2020. The triennial assessments were not completed by Newhall because of the COVID-19 pandemic school closures. Further, G.P.'s 2019 IEP (the "2019 IEP") had expired in May 2020. Newhall prepared a new "transfer" IEP dated August 20, 2020 (the "Transfer IEP") to inform defendant what services G.P. had been provided. The Transfer IEP was set to expire on October 13, 2020. The Transfer IEP did not contain any specific goals or objectives nor any prescribed methodologies to be used for G.P.'s behavior services. The Transfer IEP also did not contain any specifics about who should provide, or any qualifications needed in order to provide, G.P.'s behavior services.

On September 29, 2020, the parties met to discuss

2

G.P.'s special education needs.  Shortly thereafter, G.P. began the 2020-2021 school year at defendant's elementary school.  Defendant used a paraprofessional to provide G.P. special education services in the classroom.

On October 13, 2020 (the day the Transfer IEP was set to expire), the parties held G.P.'s first IEP meeting since plaintiffs relocated to Idaho.  At this meeting, defendant indicated that the Transfer IEP was insufficient because it did not contain any goals or objectives.  Further, the parties discussed whether defendant's use of a paraprofessional was appropriate.  Instead of a paraprofessional, G.P.'s school in California had used a Board Certified Behavior Analyst ("BCBA") and a Registered Behavior Technician ("RBT") who were certified in the use of Applied Behavior Analysis ("ABA").

In addition, the parties considered various goals for G.P. and reviewed information obtained from G.P.'s previous school and informal assessments collected by G.P.'s current teachers.  The parties used this information to develop an interim IEP (the "Interim IEP").  The Interim IEP included goals and objectives in areas of communications, mathematics, reading, writing, and social-emotional needs.  The Interim IEP also had an attachment titled "Behavior Intervention Planning" which referred to the Newhall 2019 IEP multiple times, stating that "on 8/20/20 CA decided to continue this plan until they could reconvene in the fall due to COVID."  However, neither the 2019 IEP nor the attached 2019 Behavior Intervention Plan stated that services were to be provided by a BCBA or RBT.

Defendant then began providing G.P. with special

3

education services consistent with the Interim IEP. Specifically, while attending defendant's school, G.P. was accompanied by a paraprofessional who provided one-on-one special education services in G.P.'s general education classroom, during lunch, and at recess.  G.P. also began to receive other services, including services from a special education teacher and a speech pathologist.

On October 28, 2020, the parties held another IEP meeting, at which defendant indicated that various assessments were needed.  On November 11, 2020, the parties held another IEP meeting during which plaintiffs agreed to some of the assessments requested by defendant.  However, plaintiffs would not agree to any behavior assessments.  After the November 11 meeting, plaintiffs were sent a consent form so defendant could proceed with their requested assessments.  Plaintiffs signed the consent form but added a note explicitly denying consent for any behavior assessment.  Plaintiffs explained that their consent to any behavioral assessment was conditioned on the assessment being performed by an independent third party.  Defendant did not agree to a third-party assessment, noting that it had not yet conducted its own assessment.

On March 2, 2021, plaintiffs submitted a Due Process Complaint to the Idaho Department of Education.  The complaint alleged that defendant failed to provide G.P. with educational benefits afforded to students with disabilities under the IDEA.

A due process hearing was held on May 26-27, 2021.  The hearing officer found that defendant's use of a paraprofessional, as opposed to an ABA therapist, to provide G.P. with his behavior

4

services did not deny him a "free appropriate public education" (a "FAPE") under the IDEA because: (1) methodology decisions are left to school districts and therefore deciding to use a paraprofessional was within defendant's discretion; and (2) the evidence presented at the hearing showed that the use of a paraprofessional is comparable to the use of an ABA therapist. (Hr'g Officer Dec. at 12-13.)  Further, the hearing officer concluded that, because plaintiffs refused to consent to behavior assessments, they were precluded from claiming defendant had not provided behavior related services.  (Id. at 14.)

Since the due process hearing, G.P. has continued to receive special education services, including one-on-one assistance from a paraprofessional, services from a special education teacher, and speech therapy.

The parties eventually agreed to a behavioral assessment which was performed by Yrenka Lolli-Sunderlin on December 20, 2023.  Ms. Sunderlin reported, among other things, concern with G.P. receiving excessive "prompts" from the paraprofessional working with G.P. in the classroom, and she provided recommendations in order to reduce prompt dependence.

Plaintiffs' expert Allison Bickelman, a BCBA who had previously worked with G.P., and defendant's employee Andrea Cox, also a BCBA, observed G.P. on October 7-8, 2024.  Based on these observations, the Sunderlin report, and concerns with G.P.'s behavior outside the classroom, plaintiffs' expert and plaintiffs continue to assert that G.P. requires the assistance of an RBT overseen by a BCBA.  In contrast, defendant's expert opined that G.P. does not require an RBT directly supervised by a BCBA, and

5

she and district staff testified at trial that G.P., while not at the same level of his non-disabled peers, has made significant progress over the years and especially during the last school year.

II. Analysis

"[J]udicial review in IDEA cases differs substantially from judicial review of other agency actions, in which courts are generally confined to the administrative record and held to a highly deferential standard of review." Ojai Unified Sch. Dist. v. Jackson, 4 F.3d 1467, 1471 (9th Cir. 1993) (citation omitted). When reviewing a hearing officer's determination in an IDEA case, the district court should "read the administrative record, consider new evidence, and make an independent judgment based on the preponderance of evidence and giving due weight to the hearing officer's determinations." Capistrano Unified Sch. Dist. v. Wartenberg ex rel. Waternberg, 59 F.3d 884, 892 (9th Cir. 1995). Further, "the IDEA does not empower courts to 'substitute their own notions of sound educational policy for those of the school authorities which they review.'" Ojai, 4 F.3d at 1472 (quoting Gregory K. v. Longview Sch. Dist., 811 F.2d 1307, 1311 (9th Cir. 1987)) (additional citations and quotations omitted).

Because the court has heard the testimony of the numerous witnesses and was able to examine all of the parties' exhibits and receive additional exhibits after trial, the court makes its own findings and determinations independent of the factual findings and legal determinations expressed by the hearing officer.

Plaintiffs challenge the hearing officer's

determinations that (1) defendant did not deny G.P. a FAPE by using a paraprofessional to provide behavior services because such services are "comparable" to those provided by an ABA therapist; and (2) defendant's failure to provide an independent educational evaluation did not result in the denial of FAPE because plaintiffs had refused to provide consent to behavior analysis and assessments.[1] (See Hr'g Officer Decision at 12-14.) The court will address those determinations below.

### A. Use of Paraprofessionals

Under the IDEA, "a child with a disability who transfers school districts within the same academic year, who enrolls in a new school, and who had an IEP that was in effect in another State" must be provided "services comparable" to those provided in the original district until a new IEP is developed. See 20 U.S.C. § 1414(d)(2)(C)(i)(II).

The IDEA does not define the term "comparable," and neither the Department of Education nor the courts have given much guidance regarding its meaning under the IDEA. In normal usage, "comparable" could be defined as capable of being compared. When two or more things have enough features in common, it generally makes sense to compare them. This could apply to anything from restaurants or automobiles to methods of teaching autistic children. When two or more things do not have enough features in common, they are generally understood not to

---

[1] The court notes that the hearing officer did not make an explicit finding about whether plaintiffs were denied an IEE. Rather, the hearing office made a related finding that plaintiffs could not assert a claim alleging that G.P. was denied a FAPE in connection to the defendant's provision of behavior services because plaintiffs had not provided consent to behavior assessments. (See Hr'g Officer Decision at 14.)

7

be comparable.

The Department of Education has taken a somewhat different approach in attempting to define what is comparable. It has interpreted the term "to have the plain meaning of the word, which is 'similar' or 'equivalent.'" See Assistance to States for the Educ. of Child. With Disabilities & Presch. Grants for Child. With Disabilities, 71 Fed. Reg. 46540, 46681 (Aug. 14, 2006).  Thus, "when used with respect to a child who transfers to a new public agency . . . 'comparable' services means services that are 'similar' or 'equivalent' to those that were described in the child's IEP from the previous public agency, as determined by the child's newly-designated IEP Team in the new public agency." Id.

In the court's view, "similar" and "equivalent" have slightly different meanings.  Two things are similar when they have a sufficient number of relevant features in common.  Two things are equivalent if they possess equal value -- in other words, equal usefulness for a particular purpose, even if achieved by different means.  One thing is clear, however: in order to be "similar" or "equivalent," two things need not be identical or the same.

Given the ambiguity of the term comparable, the court looks holistically at the services in the prior school district and the current school.  This approach accords with that taken by courts to compare the services and objectives as articulated in a student's IEP as well as within the school context as a whole. See Sterling A. ex rel. Andrews v. Washoe Cnty. Sch. Dist., No. 3:07-cv-245-LRH-RJJ, 2008 WL 4865570, at *5-6 (D. Nev. Nov. 10,

2008) (finding services "comparable" where the only difference was the location of the services being offered); W. Orange Bd. of Educ. v. B.R. o/b/o B.R., No. 21-cv-13849, 2022 WL 2903341, at *5 (D.N.J. July 22, 2022) (finding services were not "comparable" where there were "significant differences in class size, school size, student-teacher ratio, and the proportion of classified students per class").

Here, plaintiffs contend that defendant's use of a paraprofessional to provide G.P. with behavior services under the Interim IEP is not "comparable" to his California school's use of RBTs and BCBAs. However, the only description of "Behavior Intervention Services" in the Transfer IEP are the general statements relating to the duration and frequency of services -- specifically, that (1) G.P. would receive services for a total of 1950 minutes per week in the regular classroom "plus monthly clinic meeting attendance (1 hour)," and (2) there would be 420 minutes of "supervision for BI, consultation with school staff, 1 hour per month for clinic meeting."

The Transfer IEP did not specify that behavior services must be provided by a RBT or BCBA. Nor did it provide any objectives that would have indicated that services provided by a paraprofessional would not meet the requirements of the IEP. Further, the court heard lengthy testimony from defendant's staff that they were provided ABA training and that staff applied ABA principles in working with G.P., including paraprofessionals overseen by qualified special education teachers.[2]

---

[2] At trial, plaintiffs referred extensively to the expired 2019 IEP. However, as mentioned above, the 2019 IEP also does not specify that services were to be provided by an RBT and

 1          As the Ninth Circuit has articulated, methodology is a
 2   discretionary decision left to school districts.  See, e.g.,
 3   Crofts v. Issaquah Sch. Dist. No. 411, 22 F.4th 1048, 1056-57
 4   (9th Cir. 2022).  Therefore, absent the Transfer IEP's
 5   instructions to the contrary, it was within defendant's
 6   discretion to use a paraprofessional instead of an RBT or BCBA.
 7   See R.P. ex rel. C.P. v. Prescott Unified Sch. Dist., 631 F.3d
 8   1117, 1122 (9th Cir. 2011) ("The IDEA accords educators
 9   discretion to select from various methods for meeting the
10   individualized needs of a student, provided those practices are
11   reasonably calculated to provide him with educational benefit.")
12   (citations omitted).  While plaintiffs may have assumed that G.P.
13   should receive identical services at his new school, "the fact
14   that the IDEA is a federal statute does not mean that every state
15   must administer the act in the same way."  J.B. ex rel. B.B. v.
16   Lake Wash. Sch. Dist., No. C12--0574RSL, 2013 WL 195375, at *2
17   (W.D. Wash. Jan. 17, 2013) (because some "states have chosen to
18   provide evaluation and educations services that go beyond the
19   statutory requirement," the fact that a student was receiving
20   services in one state "does not automatically mean that he is
21   eligible for services in" another state).
22          Likewise, even if plaintiffs are correct that RBTs and
23   BCBAs are better suited to provide G.P.'s behavior services,
24   defendant's use of a paraprofessional does not deny G.P. a FAPE
25   where the evidence does not show that G.P. has been unable to
26   access his education.  See Union Sch. Dist. v. Smith, 15 F.3d
27   1519, 1524 (9th Cir. 1994) ("An 'appropriate' public education
28   a BCBA.

does not mean the absolutely best or 'potential-maximizing' education for the individual child . . . The states are obliged to provide 'a basic floor of opportunity' through a program individually designed to provide educational benefit to the handicapped child.") (citations and internal quotations omitted).

Plaintiffs have not persuaded the court that G.P.'s educational experience would be meaningfully different if his services were provided by an RBT supervised by a BCBA rather than a paraprofessional. While the services he has received from defendant are not identical to those in his prior school district, they are, based on the court's view of the evidence, similar or equivalent, and thus comparable. Plaintiffs' main complaint about defendant's use of paraprofessionals appears to be that they gave G.P. prompts too quickly and too frequently. Ms. Sunderlin and Ms. Bickelman expressed that concern at length in their testimony based on their classroom observations in 2023 and 2024. While there may be room for improvement in the use of prompts, the court nevertheless finds that defendant's use of paraprofessionals is similar or equivalent to the use of RBTs and is therefore comparable under the IDEA.

The court was impressed with evidence at trial showing the extensive resources and effort expended by defendant's teachers, aides, and other staff who have worked directly or indirectly with G.P. throughout his time in the school district.[3]

---

[3] Perhaps the most persuasive evidence of the dedication of the teachers and staff to G.P.'s education were the video recordings which the court viewed of the various meetings with Ms. Panicacci. These were not produced for litigation purposes, nor did it appear that any of the participants anticipated the recordings would be used at trial. What they did demonstrate was

11

The court has no doubt that both sides in this case shared, and continue to share, a common objective in providing G.P. with a quality education. However, the teachers and staff were required to exercise their own professional judgment in deciding how to achieve that objective and were not required to defer to the suggestions of G.P.'s parents. See, e.g., Crofts, 22 F.4th at 10156 (school districts are entitled to deference in deciding what programming is appropriate as a matter of educational policy).

Overall, the evidence shows that under the IDEA, defendant's use of paraprofessionals is "comparable" to the use of an RBT supervised by a BCBA, and defendant's use of a paraprofessional to provide behavior services did not deny G.P. a FAPE.[4]

B. Independent Educational Evaluation[5]

Federal regulations provide that parents of a child

---

the professionalism and sincere interest of the faculty in G.P.'s progress and in addressing Ms. Panicacci's concerns.

[4] The court also rejects plaintiffs' implicit suggestion that the Newhall School District's provision of services via RBTs and a BCBA would require defendant to provide such services in perpetuity. Even assuming the Transfer IEP explicitly prescribed such services, which it did not, the IDEA requires, at a minimum, triennial assessments, and IEPs are valid for no longer than one year, and thus the services provided by the school district may change from year to year based on the needs of the student. See 20 U.S.C. § 1414(d)(2)(C)(i)(II) (where child with an IEP transfers to a school in a new state, the new school must provide comparable services until the new school develops a new IEP); see also 34 C.F.R. § 300.323(f) (same).

[5] Defendant contends that plaintiffs' claim regarding an IEE is moot in light of the parties' agreement that G.P. receive a functional behavioral assessment from Ms. Sunderlin, which occurred on December 20, 2023. The court assumes, without deciding, that the claim is not moot.

12

with a disability have the right to an IEE "at public expense if the parent <u>disagrees</u> with an evaluation obtained by the public agency." 34 C.F.R. § 300.502(b)(1) (emphasis added). Plaintiffs argue that defendant's refusal to provide an IEE violated the IDEA.

"A procedural violation of the IDEA constitutes a denial of a FAPE if there are 'procedural inadequacies that result in the loss of educational opportunity, or seriously infringe on the parents' opportunity to participate in the IEP formulation process, or cause a deprivation of educational benefits." <u>D.O. ex rel. Walker v. Escondido Union Sch. Dist.</u>, 59 F.4th 394, 414 (9th Cir. 2023) (quoting <u>Amanda J. ex rel. Annette J. v. Clark Cnty. Sch. Dist.</u>, 267 F.3d 877, 892 (9th Cir. 2001)) (cleaned up). "A loss of an educational opportunity occurs, for example, when there is a 'strong likelihood' that, but for the procedural error, an alternative placement 'would have been better considered.'" <u>Id.</u> at 417 (finding delay in IEP assessment did not deprive student of an educational opportunity even if the delay constituted a procedural violation of IDEA because "there was no evidence that if the assessment had been conducted earlier, an alternative placement would have occurred") (cleaned up).

Here, due to plaintiffs' refusal to consent to the school district's requested behavioral assessment, there was no evaluation of G.P. with which plaintiffs could disagree. Thus, plaintiffs did not have the right to an IEE under the IDEA and applicable federal regulations. See 34 C.F.R. § 300.502(b)(1); see also <u>G.J. v. Muscogee Cnty. Sch. Dist.</u>, 668 F.3d 1258, 1266

13

(11th Cir. 2012) ("[T]he right to a publicly funded independent educational evaluation does not obtain until there is a reevaluation with which the parents disagree."); C.M.E. o/b/o W.P.B. v. Shoreline Sch. Dist., No. 2:19-cv-02019-RAJ-BAT, 2020 WL 10141433, at *6 (W.D. Wash. Nov. 9, 2020) (consenting to only a portion of a proposed assessment constitutes a complete refusal to consent) (citations omitted).

In their November 11, 2020 meeting with defendant, and at trial, plaintiffs expressed that they would not consent to a behavior assessment because they believed that the district was biased. Regardless of the validity of plaintiffs' reasoning, their refusal to consent to a behavior assessment meant that there was no assessment with which they disagreed and thus there was no right to an IEE. Cf. G.J., 668 F.3d at 1264-64 ("[I]f a student's parents want him to receive special education under IDEA, they must allow the school itself to reevaluate the student . . . .") (citation and quotations omitted).

Plaintiffs argue that defendant's review of G.P.'s school record, including his prior IEPs, constitutes an evaluation. The regulations upon which plaintiffs rely prescribe what a public agency must do when conducting an evaluation. See 34 C.F.R. § 300.15 ("Evaluation means procedures used in accordance with §§ 300.304 through 300.311 to determine whether a child has a disability and the nature and extent of the special education and related services that the child needs."); 34 C.F.R. § 300.304(b)(1) ("In conducting the evaluation, the public agency must use a variety of assessment tools and strategies to gather relevant functional, developmental, and academic information

about the child . . . .").

The regulations do not provide, however, that reviewing only a student's school record sufficiently constitutes an evaluation for purposes of the IDEA. Cf. 34 C.F.R. § 300.304(b)(2) ("[T]he public agency must . . . [n]ot use any single measure or assessment as the sole criterion . . . for determining an appropriate educational program for the child . . . ."). Moreover, anything short of a formal evaluation does not satisfy a school's statutory evaluation obligation under the IDEA. See Timothy O. v. Paso Robles Unified Sch. Dist., 822 F.3d 1105, 1122 (9th Cir. 2016) (finding a psychologist's informal observations of a student did not satisfy the school's evaluation obligation under the IDEA).[6] Because it is undisputed that plaintiffs did not consent to a behavior assessment, they were not entitled to an IEE, and defendant's refusal to provide one did not violate the IDEA.

III. Conclusion

For all the foregoing reasons, because the court finds that defendant has provided G.P. with a free appropriate public education, judgment shall be entered in favor of defendant on plaintiffs' IDEA claim. Pursuant to this order and the jury's verdict for defendant on the ADA and Rehabilitation Act claims, IT IS HEREBY ORDERED that judgment be entered in favor of

---

[6] Plaintiffs also appear to argue that defendant should have initiated a due process hearing in the face of plaintiffs' failure to consent to a behavioral assessment. However, plaintiffs have provided no authority, and the court is unaware of any, that required the school district to do so, or which shows that this option has any relevance to the question of whether G.P. was entitled to an IEE where his parents refused consent for the district's own evaluation.

defendant on all claims.

Dated: May 28, 2025

_____
WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE